IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


**EQUIPMENT FINANCE PARTNERS**,

        Plaintiff,

    v.

**ROY ROSE and JOHN G.L. HOPKINS**,

        Defendants.

3:13-cv-00734-MO

**OPINION AND ORDER**

**MOSMAN, J.**,

    This lawsuit arises out of a series of leases, guaranties, and business dealings between Equipment Finance Partners ("Altec"),[1] Defendants Roy Rose and John Hopkins ("Defendants"), The Phoinix Group ("TPG"), and Phoinix Corporation ("PC"). In 2007, TPG was in negotiations to acquire PC, but PC carried a substantial amount of debt after falling behind on payments for a large amount of equipment. To help facilitate the acquisition, Altec agreed to satisfy PC's outstanding debt, essentially purchasing the equipment, and then leased the equipment back to TPG. TPG was to make monthly payments to Altec for sixty months, after

---

[1] Equipment Finance Partners is a division of Altec Capital Services, LLC. This opinion will refer to the plaintiff as Altec.

1 – OPINION AND ORDER

which TPG would own the equipment free of Altec's security interest. This transaction was accomplished through a series of leases in mid-2007. Defendants—high-level executives at TPG—signed personal guaranties to cover TPG's debt to Altec.

The acquisition negotiations between TPG and PC fell through, and TPG was unable to keep up with its monthly payments to Altec. TPG ceased doing business in 2010, and in early 2011, Altec notified Defendants of the outstanding balance on the leases, demanding payment within fifteen days. When payment was not forthcoming, Altec filed this lawsuit, alleging that Defendants breached their personal guaranties by refusing to cover TPG's debt to Altec. (Compl. [1] at ¶¶ 29–34.) Altec now moves for summary judgment [26], and asks this Court for an entry of judgment finding Defendants jointly and severally liable in the amount of $617,445.96. (Pl.'s Mem. in Supp. [27] at 14.) This Court has jurisdiction under 28 U.S.C. § 1332.

Because I find no genuine issue of material fact that could lead a rational jury to find in favor of Defendants, I GRANT Altec's motion for summary judgment.

## FACTS

In early 2007, TPG approached Altec and requested financing to purchase a number of pieces of heavy equipment from PC. (Griswold Decl. [28] at ¶ 7.) TPG was in discussions to acquire PC, a company that performed environmental remediation work. *Id.* at ¶ 8. Altec agreed to finance the purchase of the equipment, and entered into seven lease agreements with TPG ("the Leases"), executed between April and June of 2007. *Id.* at ¶ 11, Exs. A–G [28-1–28-7]. Under the terms of the Leases, Altec purchased the equipment from PC for $2,286,521.44, then leased the equipment to TPG for a period of sixty months. (Griswold Decl. [28] at ¶ 10. At the end of the lease period, TPG would take title to the equipment. *Id.* In the meantime, TPG took

title subject to Altec's retaining a security interest in the equipment, perfected through UCC-1 financing statements. *Id.* at ¶ 15. TPG was to pay Altec $48,801.02 per month, and Altec could collect a 10% late charge on any unpaid amount at the end of each year, as well as add a 12% per year interest rate to the unpaid balance. *Id.* at ¶¶ 13, 16.

At the time the Leases were signed, Defendant Hopkins was the Managing Director and CEO of TPG, and Defendant Rose was the Chairman of TPG. *Id.* at ¶¶ 19, 21. Each of Defendants signed an "Individual Personal Guaranty" for all indebtedness due to Altec by TPG under the terms of the Leases. *Id.* at ¶¶ 17, Exs. I–J [28-9–28-10]. Defendant Hopkins signed his guaranty on June 1, 2007, and Defendant Rose signed his guaranty on June 4, 2007. Exs. I–J [28-9–28-10]. The personal guaranties were signed in consideration of Altec's extension of credit to TPG.[2] *Id.*

TPG made sporadic payments to Altec, and by May of 2008, had fallen approximately $490,000 in arrears. (Griswold Decl. Ex. K [28-11] at 2.) TPG sent a letter to Altec on May 30, 2008, asking Altec to consent to rewriting the Leases in the name of PC. (Griswold Decl. [28] at ¶ 22.) Altec refused. *Id.* at ¶ 23. Soon afterwards, the negotiations between TPG and PC fell through, and PC filed for bankruptcy on July 30, 2008, in the Western District of Washington. *Id.* at ¶¶ 25, 26. At the time the bankruptcy proceeding was filed, Altec had received $496,309.20 for sums owing under the Leases. *Id.* at ¶ 27; Ex. H [28-8] at 1. Through the course of the bankruptcy proceedings, Altec learned that PC was in control of the leased equipment, as well as a project called the "BP contract." (Griswold Decl. [28] at ¶ 26.) TPG and PC disputed the proceeds of this contract, but the two companies settled their claims in June of

---

[2] The relevant language states: "I hereby agree to bind myself to pay [Altec] on demand any and all indebtedness which may become due, whether direct or indirect and including any interest, collection charges accruing after the filing of a petition under the Federal Bankruptcy Code by or against [TPG]." (Griswold Decl. [28] Exs. I–J [28-9–28-10].)

2009. *Id.* at ¶¶ 26, 30. According to the terms of the settlement agreement, the proceeds from the BP Contract were deposited in a third-party account. (Ex. L [28-12] at 3.). This account was then used to pay a number of TPG's creditors, including Altec; the payments to Altec were applied to "the arrearage through March 31, 2009 owed on the Leases," as well as continuing monthly payments. *Id.* at 5. Altec agreed to waive fifty percent of the late fees on the outstanding debt, as well as attorney fees and costs. (Griswold Decl. [28] at ¶ 34.) Altec received a total of $597,072.77 from the BP Contract proceeds. *Id.* at ¶ 36.

However, the proceeds from the BP Contract were insufficient to cover TPG's arrearage, and by September 1, 2009, TPG still owed Altec $221,101.26. *Id*. at ¶ 37, Ex. N [28-14].) TPG took possession of the leased equipment from PC, and notified Altec that three pieces of the leased equipment were missing, and another tractor was severely damaged. (Griswold Decl. [28] at ¶¶ 39–40.) PC tendered an insurance claim on the damaged tractor, the proceeds of which were paid to Altec. *Id.* at ¶ 41. By November of 2009, TPG moved the leased equipment to Pendleton, Oregon, where the equipment was inspected by an Altec employee and a TPG employee. *Id.* at ¶¶ 43–44. Altec allowed TPG to rent the leased equipment to another company in Pendleton called Powers, and the income from the rental was applied to TPG's debt to Altec. *Id.* at ¶¶ 46–47. With Altec's approval, TPG sold various pieces of the leased equipment from December, 2009, through September, 2010, and applied the proceeds to its outstanding debt with Altec.[3] *Id.* at ¶¶ 48–53. In October of 2010, Altec advised TPG that the parties needed to reach a resolution on the outstanding debt, because TPG remained so far in arrears. *Id.* at ¶ 54. TPG proposed liquidating the remaining pieces of equipment. Altec agreed, and the remaining leased equipment was sold to Powers between October and December of 2010. *Id.* at ¶¶ 55–61, Ex. H

---

[3] An Altec employee discovered one of the missing tractors at a feedlot in Oklahoma, and Altec agreed to sell the tractor to the Oklahoma company for $10,000. (Griswold Decl. [28] at ¶¶ 48–49.)

4 – OPINION AND ORDER

[28-8].

Even after the remaining equipment was sold, TPG still owed Altec $1,001,270.36. (Griswold Decl. [28] at ¶ 62.) Altec arrived at this figure by calculating the amount TPG should have paid under the Leases ($2,928,061.20) and subtracting the amount actually paid ($1,976,760.84). (Ex. H [28-8].) Soon afterward, TPG ceased doing business, so Altec made a demand on Defendants (as guarantors) in the amount of $600,182.00, plus accruing interest, attorney fees, and costs. (Griswold Decl. [28] at ¶ 65, Ex. O [28-15].) Altec arrived at this lower number by calculating the "actual net book value loss" of the leased equipment; that is, the net book value of the leased equipment at the time the equipment was sold less the amount paid for the leased equipment. (Griswold Decl. [28] at ¶ 66, Ex. P [28-16]. To date, Defendants have made no payments to Altec under the terms of the Leases or the personal guaranties. *Id.* at ¶ 72. In preparing for this suit, Altec recalculated its net book value loss to correct an error and now seeks $617,445.96. *Id.* at ¶ 69.

## LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the initial burden lies with the moving party, who must inform the court of the basis of its motion and provide evidence to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the nonmoving party must then "present significant probative evidence tending to support its claim or defense." *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (internal quotation marks omitted). The nonmoving party fails to meet its burden if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party." *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The court must view the evidence in the light most favorable to the nonmoving party, drawing all reasonable factual inferences in the nonmoving party's favor. *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).

## DISCUSSION

Altec argues that Defendants breached the terms of the guaranties by failing to honor TPG's outstanding debt. Defendants make three counter-arguments: (1) the guaranties were not supported by consideration and are not binding contracts; (2) assuming the guaranties are binding contracts, the PC bankruptcy proceeding altered the underlying risk to the principal obligation, freeing Defendants of their guaranty obligation; and (3) Altec previously released Defendants from liability.

### I.     Altec's Breach of Contract Claim

A claim for breach of guaranties is treated like any other breach of contract. *See White Stag Mfg. Co. v. Wind Surfing, Inc.*, 67 Or. App. 459, 466 n.8, 679 P.2d 312, 316 n.8 (1984). A plaintiff seeking damages for a breach of contract must prove: (1) a valid contract existed; (2) the defendant breached a term of the contract; (3) the plaintiff substantially performed its obligations or those obligations were excused; and (4) the defendant's breach caused the plaintiff damages. *See Parvin v. CNA Fin. Corp.*, No. 10-6332, 2013 WL 5530618, at *5 (D. Or. Oct. 4, 2013) (citing *Rizio v. U-Lane-O Credit Union*, 178 Or. App. 498, 502, 37 P.3d 220, 221–22 (2001)); *Nissan Motor Acceptance Corp. v. Khorasani*, No. 10-318, 2011 WL 465338, at *2 (D. Or. Feb. 4, 2011) (citing *Pendleton Grain Growers v. Pedro*, 271 Or. 24, 28, 530 P.2d 85, 87 (1975); *Aurora Aviation, Inc. v. AAR W. Skyways, Inc.*, 76 Or. App. 598, 602, 707 P.2d 631 (1985)).

### A.   *Existence of a Valid Contract*

"Contract formation requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Ken Hood Const. Co. v. Pac. Coast Const., Inc.*, 201 Or. App. 568, 578, 120 P.3d 6, 11 (2005) (internal quotation marks omitted). Altec argues that the Leases were properly executed by Altec and Defendant Hopkins, an agent of TPG. (Pl.'s Mem. in Supp. [27] at 8–9.) Further, Altec argues that the personal guaranties were properly executed by Defendants. *Id.* at 9. Because Defendants "understood that they unconditionally agreed to assume responsibility for paying all of the TPG indebtedness to Altec," there was mutual assent between the parties at the time the guaranties were executed. *Id.*

Altec further argues the contractual relationship was supported by consideration. Consideration is "some right, interest, profit, or benefit or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other." *Shelley v. Portland Tug & Barge Co.*, 158 Or. 377, 387, 76 P.2d 477, 481 (1938). With respect to the Leases, TPG benefitted from the exchange because it received financing to obtain the equipment from PC, and Altec stood to profit from the lease repayments. (Pl.'s Mem. in Supp. [27] at 10.) With respect to the guaranties, an agreement to extend credit to a third party (here, TPG) is sufficient consideration for the execution and delivery of a guaranty. *See Balfour v. Knight*, 86 Or. 165, 171, 167 P. 484, 485–86 (1917) ("There is no merit to the contention that [a] contract of guaranty is void for want of expressed consideration. The authorities are practically agreed that a future credit to be extended to the debtor is a sufficient consideration . . . ."). The extension of credit to TPG serves as consideration for Defendants' personal guaranties. (Pl.'s Mem. in Supp. [27] at 11.)

### B.   *Breach*

Altec next contends that "[t]he uncontroverted evidence establishes that TPG is in default

of the payment terms of the leases." (Pl.'s Mem. in Supp. [27] at 12.) Further, Altec has made demand of Defendants to pay the indebtedness due and owing to Altec from TPG, pursuant to the terms of the personal guaranties, but Defendants have not performed their obligation to honor the debt owed to Altec by TPG. Because the personal guaranties provide that Defendants will pay Altec "any obligation of [TPG]" and will be "liable for all present and future debts of [TPG]," Defendants' refusal to pay Altec the debt owed by TPG under the terms of the Leases constitutes a breach of the personal guaranties. *Id.* at 12–13; Griswold Decl. [28] Exs. I–J [28-9–28-10].

### C. *Altec's Obligations*

Altec argues that it has fully performed its obligations under the Leases and personal guaranties. (Pl.'s Mem. in Supp. [27] at 11–12.) TPG executed the Leases, and Defendants entered into the personal guaranties, in consideration of Altec's extension of credit to TPG in order to finance the acquisition of equipment from PC. *Id.* Altec extended $2,286,521.44 of credit to TPG. *Id.*; Griswold Decl. Ex. H [28-8]. This extension of credit fulfilled Altec's obligation to finance the acquisition of the equipment. (Pl.'s Mem. in Supp. [27] at 12.)

## II. **Defendants' Response**

Defendants concede that TPG defaulted on the Leases. (Defs.' Resp. [30] at 5.) Defendants do not argue that they have in fact made payments to Altec on TPG's outstanding debt. Rather, they make three arguments as to why they should not be liable for failing to guarantee TPG's debt to Altec.

### A. *Guaranties Not Supported by Consideration*

A guaranty, like any other contract, must be supported by consideration. A guaranty contract is supported by "sufficient consideration" when future credit is extended to a debtor.

*Balfour*, 86 Or. at 171.  However, "the undertaking of one not a party to the original transaction who, in pursuance of some subsequent agreement, signs as a guarantor after the original contract has been fully executed and delivered, is a new and independent contract, and, to be binding, must be supported by a new and independent consideration."  *Tomihiro v. United Hotel Corp.*, 145 Or. 629, 632, 28 P.2d 880, 881 (1934).  Here, Defendants first argue that the personal guaranties were not supported by consideration, and are thus unenforceable.  (Defs.' Resp. [30] at 5–6.)  Defendants distinguish *Balfour*, where future credit extended to a debtor was sufficient consideration to support a guaranty contract, and rely on *Tomihiro*, where later guaranties unsupported by independent consideration were not binding contracts.  Defendants argue that because their personal guaranties were executed after Altec's extension of credit to TPG and were not supported by additional consideration, their personal guaranties are not binding.  *Id.* at 6–8.

The Leases between Altec and TPG were executed on April 19, May 2, May 30, and June 1, 2007.  (Griswold Decl. Ex. A [28-1] at 5, Ex. B [28-2] at 5, Ex. C [28-3] at 5, Ex. D [28-4] at 6, Ex. E [28-5] at 6, Ex. F [28-6] at 6, Ex. G [28-7] at 5.)  Defendant Hopkins executed his guaranty on June 1, 2007.  (Ex. I [28-9] at 1.)  Defendant Rose executed his guaranty on June 4, 2007.  (Ex. J [28-10] at 1.)  "Neither defendant received any compensation or other consideration from Altec, TPG or any other person or entity for providing the subsequent guaranty of the TPG Leases."  (Defs.' Resp. [30] at 8.)  Defendants contend that because the guaranties were not supported by additional consideration, they are not enforceable, and summary judgment on Altec's breach of guaranty claim is inappropriate.  *Id.*

I find this argument without merit, as the personal guaranties were executed contemporaneously with the Leases as part of a single transaction.  Defendants' reliance on

*Tomihiro* is misplaced, because that case involved guaranties executed two years after the underlying obligation was executed, and the guarantors testified to the lack of additional consideration supporting their guaranties. *See Tomihiro*, 145 Or. at 631, 28 P.2d at 881. The *Tomihiro* court noted that if the guaranties were meant to be part of the original transaction, additional consideration would be unnecessary. *Id.* at 632. Further, a modest delay in the execution of a guarantee does not negate the underlying consideration where the guaranties are meant to be part of the same transaction. *See Ruby v. West Coast Lumber Co.*, 139 Or. 388, 397, 10 P.2d 358, 361 (1932); *see also Cardinal Health 110, Inc. v. Cyrus Pharm., LLC*, 560 F.3d 894, 901 (8th Cir. 2009).

The evidence in the record demonstrates the intent of Altec, TPG, and Defendants to treat the Leases and personal guaranties as a single transaction. Five of seven lease agreements were delivered to TPG with copies of the personal guaranties. (Griswold Supp. Decl. Ex. K [35-11] at 1, Ex. L [35-12] at 1, Ex. M [35-13] at 1, Ex. N [35-14] at 1, Ex. P [35-16] at 1.) That Defendants did not return a signed personal guaranty with every individual lease is immaterial because the course of dealings between the parties evidences intent to treat the Leases and the guaranties as a single transaction. Further, the guaranties were supported by consideration in the form of Altec's extension of credit to TPG. Thus, the guaranties are enforceable against Defendants.

    **B.**    ***Bankruptcy Proceeding Altered the Risk of the Underlying Principal Obligation***

Under Oregon law, a change to an underlying principal obligation that materially increases the risk of a guarantor without the guarantor's consent will discharge the guarantor's obligations. *See Marc Nielson Oil Prods., Inc. v. Grimm Logging Co., Inc.*, 199 Or. App. 73,

79–80, 110 P.3d 120, 123–24 (2005).[4] However, if a guarantor consents to the modification, the guarantor cannot be discharged from their guaranty obligation. *Id.* at 80, 110 P.3d at 124. A material increase in risk is one that "a careful and prudent person undertaking the risk would have regarded as substantially increasing the chances of loss." *Lloyd Corp. v. O'Connor*, 258 Or. 33, 37, 479 P.2d 744, 746 (1971) (internal quotation marks omitted).

Defendants argue that the 2008 bankruptcy proceeding altered the risk associated with the underlying Leases, thereby discharging their surety obligation. (Defs.' Resp. [30] at 8.) Defendants' argument runs like this: under the Leases, title to the leased equipment was vested in TPG while Altec retained a security interest; TPG and Defendants therefore should have had "some degree of dominion and control" over the equipment; because of the PC bankruptcy proceeding and Altec's failure to object to PC's continued control over the leased equipment, TPG was "denied possession and control over the Leased equipment and the proceeds of the BP Contract for a period of some eleven months"; this lack of control proved "devastating to TPG's ability to sustain business" and increased the risk to Defendants; and the equipment was not properly maintained, resulting in missing and damaged equipment. *Id.* at 9–10.

I find this argument unavailing, for two reasons. First, Defendants offer no evidence that Altec had a duty to intervene in the bankruptcy proceeding. Second, there is no evidence in the record that the bankruptcy proceeding materially altered the risk to the underlying principal obligation, such that Defendants should be released from their surety obligation. Generally, a lender does not owe a borrower a fiduciary duty, because the parties conduct their transaction at arms' length. *See Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 650, 891

---

[4] More precisely, an "uncompensated" guarantor is discharged by any material change that may damage the guarantor, while a "compensated" guarantor is damaged only by a change that "materially increases the guarantor's risk." *Marc Nelson Oil*, 199 Or. App. at 80, 110 P.3d at 124. Here, Defendants argue only that their risks in the underlying leases materially increased, and Altec does not contend that the more lenient standard for an uncompensated guarantor applies.

11 – OPINION AND ORDER

P.2d 639, 646 (1995). Defendants have raised no genuine issue of material fact to suggest that Altec owed a fiduciary duty to TPG and was required to intervene in the bankruptcy proceeding. Further, Altec's knowledge of PC's continued control over the leased equipment is not relevant. PC always exercised control over the leased equipment prior to its bankruptcy, and Defendants always knew that PC had control—indeed, the whole point of the arrangement with Altec was to allow PC to pay off its debts in order to facilitate the acquisition by TPG. TPG took title to the equipment, Altec retained a security interest, and PC continued to use the equipment for environmental remediation. Although the equipment was likely under the trustee's control during the bankruptcy proceeding, Altec had no duty to protest this arrangement or PC's control over the equipment before the bankruptcy. In sum, the bankruptcy does not amount to a material alteration to the terms of the Leases, and does not release Defendants from their guaranty obligations.

      C.    *Altec Previously Released Defendants from Liability*

Finally, Defendants argue that Altec previously released them from liability. In 2008, Altec filed suit in Thurston County, Washington, against a company called Remtech, Defendants, and other entities (the "Altec lawsuit"). (Rose Decl. [31] at ¶ 23, Ex. A [31-1] at 1.) The Altec lawsuit arose from Remtech's failure to make payments to Altec under a lease agreement for a thermal desorption unit.[5] The Altec lawsuit was settled in 2008. *Id.* at ¶ 23. Of relevance here, the parties agreed that

    Altec, on the one hand, and the Remtech Defendants, on the other hand, agree to

---

[5] Remtech had professional and commercial liability insurance policies with an insurer called American International Specialty Lines Insurance Company ("AISLIC"). Am. Compl. at ¶ 9, AISLIC v. Remtech, Inc., No. 11-93 (D. Or. Feb. 11, 2011), ECF No. 3. Remtech sought coverage for its exposure in the Altec lawsuit, and AISLIC filed an action in the District of Oregon seeking a declaration that the policies did not cover Remtech's potential liability. *Id.* at ¶ 11. On October 11, 2012, AISLIC notified Judge Aiken that the parties had settled the coverage issue, as well as the underlying lawsuit in Thurston County. Report to Court on Status of Settlement, AISLIC v. Remtech, Inc., No. 11-93 (D. Or. Oct. 11, 2011), ECF No. 63. The case was dismissed with prejudice. Order of Dismissal, AISLIC v. Remtech, Inc., No. 11-93 (D. Or. Dec. 7, 2012), ECF No. 66.

12 – OPINION AND ORDER

> release and forever discharge one another from any and all claims, demands, damages, liabilities and causes of action of whatever nature now existing or which may hereafter arise . . . relating to or arising out of the facts alleged, transactions involved, and/or claims asserted *in the Altec Lawsuit*.

Ex. A [31-1] at 2 (emphasis added). Defendants argue that the 2008 settlement agreement released them from any claim or demand that Altec could have against them, including claims based on the personal guaranties at issue in this case. (Defs.' Resp. [30] at 12.) This argument is refuted by the plain language of the settlement agreement. The agreement defines "Altec Lawsuit" as the Thurston County case. Ex. A [31-1] at 1. Altec's complaint in that case arose from Remtech's failure to stay current on its lease payments for a thermal desorption unit. The settlement agreement is not related to the Leases, or the personal guaranties signed by Defendants, and did not relieve Defendants of liability under the guaranties.

### III.  Damages

Altec requests $617,445.96 in damages. (Griswold Decl. [28] ¶ 69.) This figure represents the "net book value loss"; that is, the net book value of the leased equipment at the time the equipment was sold less the amount paid for the leased equipment. *Id.* at ¶¶ 66, 69. The net book value loss is substantially less than the $1,001,270.36 remaining on the Leases, which represents the amount TPG owed Altec under the Leases ($2,928,061.20) minus the amount actually paid ($1,926,790.84). (Ex. H [28-8] at 1.)

Defendants argue that they owe Altec $164,831.59, as the value of the lost and damaged equipment should be subtracted from Altec's damages. (Alderman Decl. [32] at ¶ 12.) I disagree. The equipment was collateral on the debt owed to Altec. Inactivity on the part of a creditor that results in a loss or decline in value of the collateral does not relieve the surety obligation. *See* 23 Williston on Contracts § 61:26 (4th ed. 2013). Further, the Leases state that the risk of loss or damage to the equipment was borne by TPG. (Griswold Decl. Ex. A [28-1] at

13 – OPINION AND ORDER

2, Ex. B [28-2] at 2, Ex. C [28-3] at 2, Ex. D [28-4] at 2, Ex. E [28-5] at 2, Ex. F [28-6] at 2, Ex. G [28-7] at 2.)  Finally, Altec does not seek attorney fees or costs. *Id.* ¶ 70.  As Defendants have not provided evidence to the contrary, I find that Altec's request for $617,445.96 is proper.

## CONCLUSION

Because no genuine issues of material fact exist as to whether Defendants breached the terms of the guaranties or should be relieved of liability, Altec's motion for summary judgment [26] is GRANTED.

IT IS SO ORDERED.

DATED this __12th__ day of May, 2014.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge